UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVSIION

| DEAN C. GRIFFITH, | ) | CASE NO. 1:16-CV-2896 |
|---|---|---|
| Plaintiff, | ) ) ) | JUDGE SARA LIOI |
| v. | ) ) ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) ) ) | MAGISTRATE JUDGE THOMAS M. PARKER |
| Defendant. | ) ) ) | **REPORT AND RECOMMENDATION** |

## I. Introduction

Plaintiff, Dean Griffith, seeks judicial review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act ("Act"). This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

Because substantial evidence supports the ALJ's decision and Griffith has failed to identify any error of law in the ALJ's evaluation of his claim, I recommend that the final decision of the Commissioner be **AFFIRMED**.

## II. Procedural History

On April 4, 2014, Griffith filed concurrent applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") alleging disability beginning on August 1, 2013. (Tr. 162-168) The claim was denied initially on May 19, 2014 (Tr. 98-104) and on reconsideration on September 24, 2014. (Tr. 106-112) Griffith requested a hearing on October 24, 2014. (Tr. 113-114)

Administrative Law Judge ("ALJ") Jonathan Eliot heard the case on December 2, 2015. (Tr. 33-75) On January 5, 2016, the ALJ issued a decision finding Griffith not disabled. (Tr. 15-28) The Appeals Council denied Griffith's request for review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-4) Griffith instituted this action on November 30, 2016 seeking judicial review of that decision. (ECF Doc. 1)

**III.   Evidence**

   **A.   Personal, Educational and Vocational Evidence**

Griffith was born on January 30, 1962. (Tr. 130) He was living in a townhouse with his partner and his dogs. (Tr. 38. 59) Griffith completed high school (Tr. 41) and has prior work experience in loss prevention and as a photo lab assistant. (Tr. 82)

   **B.   Medical Evidence**

Griffith has been diagnosed with depression and bipolar disorder. He first sought counseling from the Nord Center on October 3, 2013. (Tr. 226-236) Griffith met with social workers William Chapman and Melissa Wheeler for a mental diagnostic assessment. He reported symptoms of depression, anxiety, mood swings, anger and auditory hallucinations. He was having thoughts of suicide once or twice a week. His depression made him want to stay in bed and he would sometimes sleep 17-18 hours straight. He sometimes forgot what he was talking about in the middle of conversations. Griffith was well-groomed; he had an average demeanor and eye contact, clear speech and logical thought process. He was not having delusions. He had no history of suicide attempts or violence toward others, and no current suicidal or homicidal ideation. Griffith's affect was mildly constricted; his behavior was cooperative; he had average intelligence and good insight and judgment. (Tr. 233) The diagnosis

was major depressive disorder recurrent with psychotic features; and "rule out" diagnosis of bipolar I disorder, most recent episode depressed. (Tr. 234)

Griffith met with John Vesel, PCC on October 23, 2013. He reported periods of depression and mania and hearing voices at night. (Tr. 269) Griffith reported increased depression to Mr. Vesel on November 5, 2013. (Tr. 267) He told Mr. Vesel that his parents had kicked him out of their house when he was 18 years old due to his sexuality. Despite his difficult history them, Griffith wanted to reconnect with his family. (Tr. 267)

Griffith met with Margaret Messerly, M.D., on November 12, 2013 at the Nord Center. (Tr. 271-276) Dr. Messerly diagnosed bipolar disorder, most recent episode depressed, with psychotic features, and panic disorder with agoraphobia. (Tr. 273) Griffith started a trial of Seroquel and continued his counseling. (Tr. 271)

On November 14, 2013, Griffith told Mr. Vesel that he was starting to feel better. He was sleeping a lot. He tended to interpret others viewing him negatively, but had been "fine" at a comic book convention. (Tr. 265) On December 4, 2013, Griffith's depression was low and his anxiety was not bad. (Tr. 263)

Griffith followed up with Dr. Messerly on December 18, 2013. He reported that Seroquel was too sedating and did not stabilize his mood. He reported a slight decrease in intensity of voices while taking medication. Dr. Messerly stopped Seroquel and started a trial of Abilify. (Tr. 261)

On January 16, 2014, Griffith reported "doing well." His mood had been okay with less severe ups and downs. He was still irritable with others. (Tr. 257) He met with Dr. Messerly on January 17, 2014. He was tolerating Abilify very well. His moods were more stable and he was sleeping consistently with less need for sleep in the day. The voices were significantly reduced.

He was being more active and had lost three pounds. He was planning to begin looking for work. (Tr. 255)

Griffith met with Mr. Vesel on February 6, 2014 and March 6, 2014. (Tr. 251, 253) In March, he complained of depression and anxiety. (Tr. 251) Dr. Messerly also noted an increase in depressive symptoms in March 2014. (Tr. 249) Griffith reported that the initial benefits of Abilify seemed to have waned. Dr. Messerly increased Abilify. Griffith also reported an increase in suicidal ideation. He was stressed by financial concerns, jury duty, and the decision to apply for disability. (Tr. 249) Dr. Messerly prepared a short letter stating that Griffith was unable to serve as a juror due to his symptoms of mental illness. (Tr. 224)

In June 2014, Griffith reported improvement in his mood with Abilify. He was still having residual depression but his auditory hallucinations were much better. On June 25, 2014, Griffith reported that he was applying for work. Dr. Vesel explained why he was unwilling to complete disability forms from Griffith's lawyer. Griffith reported that he did not feel that he was improving. He said he was putting "on a good face" at sessions. (Tr. 298)

In August 2014, Griffith reported to Mr. Vesel that he had been mean to his dogs and his partner. He had also been calling women names when shopping. He had thrown a plate while cooking. (Tr. 296) Despite these examples of losing his temper, he was working on calming himself when he was angry. (Tr. 294)

In September 2014, Griffith reported a decrease in mood swings over the course of his treatment. He was having increased worries over finances but reported no current thoughts of suicide and he was not hearing voices. (Tr. 343)

Griffith continued to meet with Mr. Vesel in November and December 2014. (Tr. 355, 357, 359) He reported sleeping more and feeling depressed but he was not having angry

4

outbursts. In December he reported enjoying Christmas activities – having a tree and Christmas cookies. He was enjoying his dogs. (Tr. 355) In January 2015, Griffith was sleeping well with less mood extremes. (Tr. 341) On February 26, 2015, Griffith's mood continued to improve. However, on March 26, 2015, Griffith's mood had declined due to his partner's house guest. (Tr. 414, 416)

Griffith met with Dr. Messerly in July 2015, having not seen her since January. He had limited access to transportation and never called for medications. He reported a depressed mood, irritability and low energy. He had been avoiding leaving the home or even walking the dog. His partner's house guest had stayed with them for four months. (Tr. 403) Griffith also attended counseling sessions with Mr. Vesel in July and August 2015. He reported bad depression and isolation. (Tr. 410, 412) On September 8, 2015, Griffith continued to complain to Dr. Messerly of worsening depression over the last couple of months. Griffith denied suicidal ideation and manic episodes. (Tr. 401)

On September 15, 2015, Griffith reported some improvement in mood and daily activities. He had been doing digital coloring and other things on his computer and was spending time with his dogs. (Tr. 407-408)

On October 22, 2015, Griffith met with Dr. Messerly and Mr. Vesel. Griffith reported an increase in isolation and anxiety. He indicated he had financial worries because his partner was in the hospital. (Tr. 399, 405)

**C.  Opinion Evidence**

**1.  Reviewing Psychologist – Karla Voyten, Ph.D. – May 2014**

On May 16, 2014, reviewing state agency psychologist, Karla Voyten, opined that Griffith did not meet or equal any listings and that he was capable of performing work involving

5

only superficial social interactions. She felt that Griffith could adapt to relatively static settings with few changes. (Tr. 79-82)

### 2. Reviewing Psychologist – Dr. Irma Johnston – September 24, 2014

On reconsideration, reviewing state psychologist, Irma Johnston, Psy.D., reviewed Griffith's file on September 24, 2014 and affirmed most of the findings of Dr. Voyten. (Tr. 88-93) Dr. Johnston found that Griffith's ability to interact with the general public was markedly limited. (Tr. 93)

### D. Testimonial Evidence

### 1. Griffith's Testimony

Griffith testified to the following summarized points at the administrative hearing:

- He was born on January 30, 1962. He lived with his disabled partner in a townhouse. (Tr. 38)

- Griffith claimed his disability began on August 1, 2013. (Tr. 41)

- He is 5'7 ½" and weighed 315 pounds. (Tr. 39)

- He does not have a driver's license. (Tr. 39) His next-door neighbor drove him to places such as the grocery store and Medicaid and provided rides to his doctors' appointments. He got a ride to the ALJ hearing from "provider ride." (Tr. 40)

- Griffith only left his house once or twice a month. (Tr. 40)

- Griffith's last job was at Marc's. Before that he worked at Best Buy in loss prevention or security. (Tr. 42-43) Toward the end of his job at Best Buy, Griffith was confrontational with management. He also missed a lot of work. (Tr. 64-65)

- Prior to working at Best Buy, Griffith worked for Cord Camera Centers as a lab assistant developing film, working on machines, and serving customers. (Tr. 43) He worked at another store as a photo lab assistant prior to working at Cord Camera Centers. (Tr. 44) At both of these jobs, he spent about half of his time waiting on customers. (Tr. 46)

- Griffith was diagnosed with bipolar disorder with psychotic features and panic disorder with agoraphobia. (Tr. 46) He sought treatment at the Nord Center, meeting

with a psychiatrist, Dr. Messerly, every other month and with a counselor, John Vesel, once or twice a month. (Tr. 46, 48)

- Griffith took the medication Latuda every day. He had previously tried Seroquel, Abilify and Trazodone. (Tr. 47-48) Griffith experienced some sleepiness and dizziness from the medications. (Tr. 49) He felt that the medications were helping but the counseling was not. (Tr. 50)

- Griffith still had thoughts of harming himself once a month. (Tr. 63)

- Griffith had trouble concentrating. He could no longer read books or pay attention to TV shows. (Tr. 52) He also forgot things often. (Tr. 53) Once or twice a week he would lose concentration during conversations and forget what he was discussing. (Tr. 53)

- Griffith got along well with his partner. He also interacted with his neighbor and rode to the grocery store with her. However, he denied any other relationships. (Tr. 55-56) Griffith stated he had social anxiety and would yell at people at the grocery store. (Tr. 56)

- Griffith continued to hear voices once or twice every week. (Tr. 58)

- He had days when he would not leave his bed due to depression. (Tr. 59)

- Griffith's partner did most of the chores and housework and took care of Griffith's dogs when Griffith was depressed. (Tr. 59)

- However, when Griffith was manic, he cleaned constantly and moved furniture around. (Tr. 64)

- Griffith felt that he could not handle stress; stress caused him to get into arguments with people or to flee the situation. (Tr. 66)

### 2. Vocational Expert – Thomas Nimberger

Thomas Nimberger, a vocational expert ("VE"), also testified. (Tr. 67-73)

- Griffith's past work was considered to be customer service – security, and a photo-finishing counter clerk. (Tr. 68)

- The VE was asked to consider a hypothetical individual of Griffith's age, education, and past work experience with no exertional limitations who was limited to simple routine and repetitive tasks, but not at a production rate pace. He could work in an environment with only occasional changes that could be learned after a short demonstration. The individual was also limited to occasional superficial interaction

7

- with co-workers and with supervisors if limited to information that was critical for the job. He could not have any contact with the public. (Tr. 70)

- Mr. Nimberger testified that this individual would not be able to perform Griffith's past jobs, but he would be able to perform the jobs of packager, laundry worker, and industrial cleaner and there were significant numbers of those jobs in the national economy. (Tr. 70-71)

- However, when the hypothetical individual was further limited to having no contact with supervisors, co-workers or public, no jobs were available. (Tr. 71)

- The VE testified that work would not be available to an individual who consistently missed two or more days each month. Work would also be unavailable to those who were off task more than 20% of the workday. (Tr. 72)

- The VE affirmed that his testimony was consistent with the DOT. (Tr. 73)

### IV. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[1]….

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

---

[1] "[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

### V. The ALJ's Decision

On January 5, 2016, the ALJ decided:

1. Mr. Griffith last met the insured status requirements of the Social Security Act on March 31, 2015. (Tr. 20)

2. Griffith had not engaged in substantial gainful activity since August 1, 2013 through the date he was last insured. (Tr. 20)

3. Griffith had the following severe impairments: bipolar disorder with psychotic features and a panic disorder with agoraphobia. (Tr. 20)

9

4. Through the last insured date, Griffith did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 21)

5. Griffith had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he was limited to simple, routine, and repetitive tasks, but not at a production rate pace. He needed to work in an environment with only occasional changes to assigned tasks or workflow, and of the sort that could be learned after a short demonstration; he was limited to occasional and superficial interaction with coworkers; he could have only occasional interaction with supervisors limited to information critical for his job; and he could not have any contact with the public. (Tr. 23)

6. Griffith was unable to perform any of his past work. (Tr. 26)

7. Griffith was born on January 30, 1962 and was 53 years old on his last insured date. (Tr. 26)

8. Griffith had at least a high school education and was able to communicate in English. (Tr. 26)

9. Transferability of job skills was not material because Griffith was not disabled whether or not he had transferable job skills. (Tr. 26)

10. Through the date last insured, there were jobs that existed in significant numbers in the national economy that Griffith could perform. (Tr. 27)

The ALJ determined that Mr. Griffith had not been under a disability from August 1, 2013 through the date last insured. (Tr. 27)

## VI. Law & Analysis

### A. Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision.");

*Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court must also determine whether proper legal standards were applied. If not, reversal is required unless the legal error is harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

**B.     Griffith's First Argument – RFC and Credibility**

Griffith summarizes his first argument as: "[t]he [ALJ's] decision is not supported by substantial evidence because he adopts an inaccurate hypothetical question * * *."[2] This poorly characterizes Griffith's first argument. Griffith is actually challenging the ALJ's residual functional capacity ("RFC") determination. The ALJ's hypothetical question to the VE matched his RFC finding. Thus, Griffith is not really disputing the ALJ's question to the VE. Rather, he argues that the RFC (and therefore the ALJ's hypothetical question) failed to include "Griffith's testimony about his symptoms and limitations.[3]" But the ALJ decision makes clear that all of the limitations from Griffith's testimony were not included in the RFC because the ALJ did not find Griffith's testimony to be fully credible. (Tr. 24) Thus, Griffith actually challenges the ALJ's credibility assessment. I analyze both the RFC and credibility determinations below.

---

[2] ECF Doc. 11, Page ID# 497
[3] ECF Doc. 11, Page ID# 498.

12

### 1. Residual Functional Capacity

The ALJ, not a physician, is responsible to determine a claimant's RFC based on the evidence as a whole. 42 U.S.C.A. § 423(d)(5)(B); 20 C.F.R. § 416.946(c). The regulations require the ALJ to evaluate several factors in determining the RFC, including all medical evidence (not limited to medical opinion testimony) and the claimant's testimony. See *Henderson v. Comm'r,* 2010 U.S. Dist. LEXIS 18644, *7 (N.D. Ohio, March 1, 2010) citing, *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004); SSR 96-5p, 1996 SSR LEXIS 2, SSR 96-8p, 1996 SSR LEXIS 5. The final responsibility for deciding the RFC "is reserved to the Commissioner." 20 C.F.R. § 416.927(e)(2).

In this case, the ALJ supported his RFC determination by citations to the medical evidence including the opinions of the state agency reviewing psychiatrists. (Tr. 78-82; 88-93) Griffith does not contend that the ALJ mishandled the medical evidence or medical opinions in the record.[4] Indeed, the ALJ's RFC determination is consistent with the only medical opinions in the record. Rather, Griffith points to his own testimony and argues that his statements were evidence of his functional limitations which the ALJ should accepted and included in his RFC findings along with the medical evidence and medical opinions in the record. Griffith has not cited any legal authority in support of this argument; nor am I aware of any such authority. The ALJ properly based his RFC determination on the medical evidence in the record coupled with those portions of Griffith's testimony the ALJ found credible.

---

[4] Plaintiff argues that Dr. Messerly's two sentence letter written to excuse plaintiff from jury duty (Tr. 224) should be construed as an opinion that plaintiff is incapable of competitive work activity. ECF Doc. 11, Page ID# 498. This argument is not well taken. Dr. Messerly's letter does not contain any explanation of plaintiff's functional limitations or even explain the symptoms that prevented him from serving as a juror.

13

## 2. Credibility

Griffith asserts that the ALJ should have incorporated into the RFC all of the limitations to which he testified. In other words, he argues that the ALJ should have found his testimony regarding his symptoms fully credible. But it is for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including the claimant. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997); *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981). However, the ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." Soc. Sec. Rul. 96-7p, 1996 WL 374186, at * 4. Rather, such determinations must find support in the record. Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make determine the claimant's credibility concerning his or her complaints "based on a consideration of the entire case record." *Rogers v. Comm'r of Soc. Sec.* 486 F.3d 234, 247 (6th Cir. 2007). The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. The consistency of the various items of information contained in the record must be scrutinized. Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect. *Id*.

Social Security Ruling 96-7p also requires the ALJ to explain his credibility determination. It "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the

reasons for that weight." *Id*. In other words, blanket assertions that the claimant is not believable are inadequate, as are credibility findings that are not consistent with the entire record and the weight of the relevant evidence. *Id.*

The ALJ determined that Griffith's medically determinable impairments could reasonably be expected to cause his alleged symptoms; however, he found that his statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible. (Tr. 24) The ALJ supported his credibility assessment by noting that the record documented only a handful of largely benign mental status examinations and lacked documentation of any significant psychiatric symptomology. (Tr. 24) He then noted inconsistencies in Griffith's subjective complaints.

> For example, the claimant reports that he stopped working in 2009 because he was "laid off"; furthermore, the record is without evidence of employment since that time. (Exhibit 2E/3; 3D). Therefore, I find there to be evidence that the claimant's lack of employment may be secondary to factors unrelated to his health (such as his release from work and his inability to obtain subsequent employment.) Moreover, during the period in question the claimant is reported as looking for work, which is indicia that the claimant himself believes that he is capable of basic work activities (Exhibit 4F/36, 56).

Finally, the ALJ found that the medical evidence in the record did not support the severity of Griffith's subjective complaints. (Tr. 24)

The ALJ explained his credibility assessment by pointing to specific portions of the record – making it sufficiently clear why he found Griffith's statements less than fully credible. We are required to defer to these findings. Griffith's argument that the ALJ should have assigned more weight to his statements is unpersuasive. In contrast to the ALJ's reference to the administrative record, Griffith has not cited any specific medical records which showed his condition to be what he testified to. It was for the ALJ to determine Griffith's credibility and to

15

assign weight to his statements in accordance with the entire record, and the ALJ did not err in doing so.

Because the ALJ supported his RFC finding by substantial evidence and because he properly assessed and explained his finding that Griffith's testimony was not fully credible, I recommend that the court affirm the ALJ's decision in regard to Griffith's first ground for relief.

### C. Griffith's Second Argument – Listing 12.04

Griffith also argues that the ALJ improperly evaluated whether Griffith met Listing 12.04. Specifically, Griffith contends that the ALJ should have obtained an updated medical opinion because Griffith believes his impairment came "very close to meeting" or at least were the equivalent to Listing 12.04. Listing 12.04 governs affective disorders, including depression disorders. The required level of severity for this Listing is met when both the "paragraph A" and "paragraph B" criteria of the Listing are met, or when the criteria of "paragraph C" are satisfied. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

"To satisfy the "paragraph A" criteria of Listing 12.04, the mental impairment must result in medically documented persistence, either continuous or intermittent, of one of the following: * * * 3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either of both syndromes.)" 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. At Step Two of the sequential analysis, the ALJ determined that Griffith had the severe impairment of bipolar disorder.[5] Thus,

---

[5] Plaintiff argues that the ALJ failed to discuss the paragraph A criteria. This argument is not well taken because the ALJ determined that plaintiff had bipolar disorder at Step Two.

16

at Step Three, the ALJ was required to determine whether Griffith also met the criteria for paragraph B or paragraph C of Listing 12.04.[6]

To satisfy the "paragraph B" criteria for Listing 12.04, the mental impairment must cause at least two of the following:

1) A marked restriction of activities of daily living;

2) A marked difficulties in maintaining social functioning;

3) A marked difficulties in maintaining concentration, persistence, or pace; or

4) Repeated episodes of decompensation, each of extended duration.

A marked limitation means more than moderate but less than extreme. *Id.,* § 12.00(C).

The ALJ used the special technique and rated the effects of Griffith's mental impairments in each of the four functional categories for Listing 12.04, paragraph B. He found that Griffith had moderate restrictions in activities of daily living, concentration persistence or pace and no episodes of decompensation. (Tr. 21-22) He found that Griffith had marked difficulties in social functioning. (Tr. 22) Consequently, Griffith did not meet the paragraph B criteria for Listing 12.04 because the ALJ found marked difficulties in only a single functional category.

Griffith argues that the ALJ should also have found marked limitations in his activities of daily living. To support this argument, Griffith again points to his own testimony that "his sleep is erratic and he has poor energy. There are days where he lays in bed (Tr. 59, 62). On those days, he goes to the restroom, and back to bed. He does not eat, shower, get dressed etc. on those days. (Id.)" ECF Doc. 11, Page ID# 504.

The ALJ determined that Griffith had only moderate limitations in activities of daily living because:

---

[6] Plaintiff does not argue that he met the paragraph C criteria for Listing 12.04, only that the ALJ erred at paragraph B.

> [T]he claimant reports he is able to care for his personal needs, albeit at a slower pace (Exhibit 6E/4). Furthermore, the claimant reports that he is able to prepare simple meals daily (Exhibit 4E/3). In light of the foregoing, I have determined that the claimant possesses no more than moderate restriction in his activities of daily living. This finding is consistent with the assessments of the State agency psychiatric consultants, Dr. Voyten and Dr. Johnston (Exhibits 1A; 4A).

(Tr. 21)

In *Young v. Secretary of HHS,* 925 F.2d 146, 150 (6th Cir. 1990), the Sixth Circuit held that an ALJ could properly find that the daily activities of a claimant who was capable of taking care of her personal needs, dusting, cleaning, cooking, reading, and running errands were "no more than slightly restricted." And in *Potter v. Comm'r of Soc. Sec.* 223 F.App'x 458, 465 (6th Cir. 2007), the Sixth Circuit affirmed an ALJ's finding of only "mildly limited" restrictions in activities of daily living when there was evidence that the claimant could attend to personal hygiene, perform household chores, do laundry and watch television.

Here, the ALJ found that Griffith was *moderately* restricted in activities of daily living. This finding was supported by the opinions of the psychological experts who reviewed Griffith's records (Tr. 79, 90) and by Griffith's own representation in a disability report. (Tr. 209) Conversely, there was little evidence contradicting Griffith's ability to attend to his activities of daily living. Griffith testified that he didn't feel like doing these things when he was depressed. (Tr. 62) But the ALJ did not find his testimony fully credible and we are required to defer to that finding.

Griffith also argues that the ALJ should have obtained an updated medical opinion before determining that Griffith did not have an impairment that met or was medically equivalent to Listing 12.04. Griffith points to SSR 96-6p, which provides that an ALJ is obligated to obtain an updated opinion from a medical expert when the ALJ believes: 1) symptoms, signs and laboratory findings in the record suggest a judgment of

18

equivalence is reasonable; or 2) when additional medical evidence is received that the ALJ believes may change the State agency medical expert's finding that the impairment(s) is not equivalent to a Listing.

The ALJ obviously did not believe that an updated opinion from a medical expert was necessary for Griffith's claim.[7] The record does not weigh against that decision. Griffith cites only his own testimony to support his argument that his impairment was equivalent to the Listing. He also argues that there were new treatment notes that post-dated the opinions of the stage agency psychologists. But, as the Commissioner argues, those treatment notes did not show any significant change in Griffith's condition. Some of the notes contain Griffith's complaints of worsening depression, but some of them note that he had expressed a more optimistic outlook. For example, on September 15, 2015, Griffith reported some improvement in his mood and daily activities. He reported doing digital coloring and other things on his computer and was spending time with his dogs. "He was able to express a zest for things he enjoyed." (Tr. 407-408) It is unlikely that the updated records, taken as a whole, would have changed the state agency medical experts' opinions, and the ALJ did not err by not obtaining an updated medical expert opinion on this claim. The ALJ supported his finding at Step Three by substantial evidence in the record, and he correctly applied the agency's regulations in determining that Griffith's impairments did not meet or medically equal Listing 12.04. I recommend that the court affirm the ALJ's decision in regard to Griffith's second argument.

---

[7] Nor does it appear Griffin made such a request at the administrative level.

## VII. Recommendation

Griffith has not identified any error of law or lack of substantial evidence supporting the ALJ's decision in this action. I recommend that the final decision of the Commissioner be **AFFIRMED**, pursuant to 42 U.S.C. §405(g).

Dated: November 28, 2017

Thomas M. Parker
United States Magistrate Judge

---

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See** *U.S. v. Walters*, **638 F.2d 947 (6th Cir. 1981). See also** *Thomas v. Arn,* **474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**